TERRITORY OF HAWAII FOR THE USE OF KAHULUI RAILROAD COMPANY, ET AL., *v.* E. C. MELLOR AND UNITED STATES FIDELITY AND GUARANTY COMPANY.

No. 2181.

ARGUED MAY 8, 9, 1935.    DECIDED JULY 30, 1935.

BANKS AND PARSONS, JJ., AND CIRCUIT JUDGE BUCK
IN PLACE OF COKE, C. J., DISQUALIFIED.

524

OPINION OF THE COURT BY BANKS, J.

(Parsons, J., dissenting.)

This is an action brought under section 2679, R. L. 1925 (now § 4364, R. L. 1935), by the Territory of Hawaii for the use of Kahului Railroad Company against E. C. Mellor and the United States Fidelity and Guaranty Company for the recovery of the sum of $103,752.61. Subsequent to the commencement of the action other persons, in pursuance of a right conferred upon them by the statute, were allowed to intervene and propound their claims for labor and material furnished in the construction of a public highway on the Island of Maui. The aggregate of these claims, together with the amount sued for by the Kahului Railroad Company, exceeded by several thousand dollars the penalty of the bond executed by the guaranty company upon which the suit was brought.

On November 30, 1929, the Territory awarded to Mellor a contract for the construction of a public highway on the Island of Maui known as the Haleakala Road. On the day the contract was let the guaranty company executed a bond in the penal sum of $115,573.30, running to the Territory, which, as we will presently see, contains the guaranties provided by the statute.

At the conclusion of the trial the circuit court at the request of the plaintiff and the intervenors directed the jury to return a verdict against the surety company for the full penalty of the bond. The jury acted in accordance with this instruction and judgment was duly entered. Exceptions were taken and allowed. Mellor pleaded and proved his adjudication and discharge in bankruptcy prior to the institution of the action and a judgment was ren-

dered in his favor and he was dismissed from the suit. The guaranty company requested a verdict in its favor, which request was refused and an exception taken and allowed. The case is here on writ of error.

The relevant portions of the statute referred to are: "Every person who shall enter into a formal contract with the Territory for the construction or repair of any public building or other public work shall be required, before commencing work under such contract to execute a bond, with good and sufficient sureties, for the due and faithful performance of the contract, and also for the prompt payment to all others for all labor and materials furnished by them to him and used in the prosecution of the work provided for in such contract; and all persons who shall have furnished labor or materials used in the prosecution of such work and not paid for may intervene and be made parties to any action instituted by the Territory on such bond, and have their rights and claims adjudicated in such action, and judgment rendered thereon; subject, however, to the priority of the claim and judgment of the Territory. If the full amount of the liability of the sureties on such bond is insufficient to pay the full amount of such claims, then, after paying the full amount due the Territory, the remainder shall be distributed pro rata among the intervenors. If no suit shall be brought by the Territory within two months from the completion and final settlement of any contract, any person or persons who shall have furnished labor and materials as aforesaid shall, upon applying therefor, and furnishing an affidavit to the superintendent of public works or other officer or officers representing the Territory in the matter of such contract that labor or materials for the prosecution of such work have been furnished by him or them, and that payment therefor has not been made, be furnished with a certified copy of the contract and bond, upon which he or they shall have a right of

action, and shall be and are authorized to bring suit in the name of the Territory in the circuit court of the circuit in which the contract was to be performed and executed irrespective of the amount in controversy in such suit, and not elsewhere, for his or their use and benefit, against the contractor and his sureties, and to prosecute the same to final judgment and execution; provided, that where suit is instituted by any such creditors on the bond of the contractor, it shall not be commenced until after the complete performance of the contract and final settlement thereof, and shall be commenced within four months after the performance and final settlement of the contract, and not later; and provided further, that where suit is so instituted by any such creditors, only one action shall be brought; and any creditor may file his claim in such action and be made party thereto within four months from the completion of the work under the contract, and not later. If the recovery on the bond should be inadequate to pay the amounts found due to all of the creditors, judgment shall be given to each creditor pro rata of the amount of the recovery."

The storm center of the case and the one around which a vigorous battle is waged is the surety company's contention that the instant action was not commenced within the period allowed by the statute and is therefore barred. Under the provisions of the statute the Territory is given the prior right to bring suit on the contractor's bond, in which suit those who have furnished labor and material as provided by the bond may intervene. If, however, such suit is not brought within two months from the completion and final settlement of the contract the person or persons described may bring the suit for their use and benefit in the name of the Territory, provided it is brought within four months from the completion and final settlement of the contract. The right given the Territory to bring the suit in its

own behalf was never exercised. In fact, so far as the record discloses, it never had a cause of action against the surety. Plaintiff's right to maintain the action is therefore undisputed unless four months from the completion and final settlement of the contract had elapsed before its commencement.

The action was commenced on February 1, 1934. It is contended by the defendant that there was a final settlement of the contract, within the meaning of the statute, on May 10, 1933, or at the latest, on June 5, 1933. If this is true the action was begun too late and judgment should have been for the surety company. On the other hand, it is contended by the plaintiff and the intervenors that the final settlement occurred on November 23, 1933. If this is true the action was brought within the time allowed by the statute, and is therefore not barred.

It is conceded by all the parties that the question of whether the action is barred by the statute is under the evidence purely one of law for the determination of the court and not one of fact to be determined by a jury. This concession was made because both the plaintiff and the defendant believed that the evidence supporting their respective contentions as to the date of final settlement was undisputed.

The contract provided that the Haleakala Road should be completed by February 2, 1932. Lyman H. Bigelow, superintendent of public works, who was the officer in charge of the contract in behalf of the government, extended the date of completion to February 2, 1933. The work, however, was not completed until April 20, 1933, making a total of about seventy-seven days' delay. On May 5, 1933, Burdick, who was the territorial resident engineer on Maui, sent the final monthly estimate to his chief, Bigelow. After Burdick and Bigelow had carefully checked this estimate the latter, on May 10, 1933,

gave his approval to what was to be the thirty-eighth and final payment on the contract. On this final monthly estimate Bigelow made itemized deductions of "inspection and engineering" costs and also added amounts for extra work on the contract. In approving this estimate he followed, as is shown by his testimony, his usual administrative practice. Thus the amount due the contractor was arrived at after both deductions and additions were included. If to the amount of the final estimate are added the amounts which were due on several other monthly estimates, together with amounts for extras but payment on which had been withheld, the total amount due the contractor would be $63,291.63. The records from which this amount could readily have been ascertained were in the custody of the superintendent of public works on May 10, 1933, and accessible to the public. There is no dispute as to the correctness of the items aggregating this amount.

The following appears from the cross, redirect and re-cross-examination of Bigelow regarding the final estimate (cross-examination): "Q Now, as I understand it, you went over the final estimate with your resident engineer in this case. A We did. Q And approved the figures submitted by him. A Yes. * * * Q And, as a result of that check, you came to the conclusion that there was $63,291.63 which the Territory was willing to pay the contractor—is that correct? A That is correct, if that is the figure shown there; I believe it is. Q As I understand you, Mr. Bigelow, in spite of all this talk that has been going on around here about these fellows doing extra work, and so on, you were thoroughly convinced that this figure you arrived at was the amount the Territory of Hawaii ought to pay in connection with the contract on its completion—is that correct? A Correct. Q And, as I understand it, if Mr. Mellor and Mr. Low and the rest

of these people here, had accepted your figures that would have been the end of it as far as you were concerned—a voucher would have been issued payable when Federal funds were available. A That is correct. * * * Q As you stated yesterday, after you had checked the final detailed estimate made up by Mr. Burdick, and approved it, you were convinced that was all the money the · Territory should pay the contractor under this contract— is that correct? A Yes, it was; of course, there was one other item which wasn't determined, which was liquidated damages, at the time. Q I understand that, Mr. Bigelow, but as far as the money due under the contract, the sum you gave us yesterday,—May I have that voucher, Mr. Clerk?—$63,291.63, was the only figure which you would ever be willing to pay under this contract—is that correct? A. That is correct. Q And when you say liquidated damages hadn't been disposed of—by that I understand you to mean that, if Mr. Low, and his associates, were going to press a claim for $150,000.00, you would press a counter claim for liquidated damages—is that correct? A That is correct. Q In other words, the only reason that a voucher wasn't issued for the $63,291.63 was the $150,-000.00 claim that these people were putting out. Q [A] The only reason it wasn't issued was because we hadn't come to an agreement between their figures and our figures—which involved liquidated damages; and I couldn't do that until I received a letter from the trustee in bankruptcy stating they had agreed to those figures. Q Of course, had they come to an agreement in May, as to your figures, a voucher would have been issued for that amount. A If we had come to an agreement it could have been issued. Q And it would have been issued too. A Yes." (Redirect examination): "Mr. Vitousek: Mr. Bigelow, you have mentioned several times there was still a question of liquidated damages to be

determined—what did you mean? A The contract carried one hundred fifty ($150.00) dollars a day liquidated damages over and above the contract time and, in adjusting final payment, we reserved the right with the contractor to adjust that when the final settlement was made —and that was done; so, depending upon whether our figures were accepted—as some sort of compromise—we let it go until I knew how much liquidated damages would be assessed. Q And, if the trustees didn't accept these figures, you would have assessed the liquidated damages. A Some—but I don't know how much we would have assessed. Q And that matter had not been determined. A It had not." (Recross-examination) : "Q As I understand it, your present recollection is that all these vouchers were prepared on June 5th, but that the date of final settlement was typed in on November 23rd, or thereabouts, after you had arrived at an agreement with the contractor as to this claim? A That was done tentatively; after I arrived at an agreement with the contractor, I determined that day was the date of final settlement, and that date put on there. Q When you use the term 'final settlement' you mean the date you agreed with the contractor on figures. A When I agreed with him then I determined that date; I set that as the date. Q Now, when you had these several conversations, Mr. Bigelow, with Judge Heen, Miss Ashford and Mr. Edmondson about final settlement you, of course, were referring to the fact that you had not yet arrived at an agreement with the contractor—is that correct? A That is correct."

The evidence also discloses that as far back as the middle of 1932 A. P. Low, who was the engineer and superintendent of construction for Mellor, informed Burdick that claims would be made at the end of the job for extras and that a discussion of this matter was had between Bigelow and Burdick approximately when the work was completed,

which, as we have seen, was April 20, 1933. It is evident from the final estimate which Bigelow approved on May 10, 1933, that he must on that date have known of a claim for extra work performed and that he then administratively determined the amount due on this item. This is conclusively shown by the credit contained in the final estimate which is as follows: "Total extra work performed $4,878.59."

The evidence shows that Mellor was not satisfied with Bigelow's estimate of the amount due for extras and claimed a much larger sum. In a letter to Bigelow dated August 2, 1933, he insisted that $150,000 was the correct sum. This, however, was not the first time Bigelow knew that Mellor contemplated making a larger claim for extras. This is shown by the following portion of Bigelow's testimony: "Q Now, with reference to the letter that you received, written on behalf of the contractor, demanding extras and, I believe, damages in the sum of $150,000.00, did you have any discussion before that time with the contractor about your going to put in a claim for extras and possibly damages? A I understood they were working up a claim. * * * Mr. Heen: Did you have any discussion with either Mr. Burdick or Mr. Low, representing Mr. Mellor? A I had a discussion with Mr. Burdick. Q When did you first have this discussion with Mr. Burdick? A I can't remember exactly; about the expiration of the contract, as I remember it. Q At about that date? A Possibly—approximately. Q You had this discussion with Mr. Burdick about this proposed claim for extras and possible damages prior to June 5th, 1933. * * * Yes."

On March 4, 1933, Alexander & Baldwin, local agents for the Kahului Railroad Company, the plaintiff in the instant case, sent a letter to Bigelow inquiring whether the sum of $69,510.62 was the amount due the contractor under the contract. On June 5, 1933, Bigelow replied to

this letter, enclosing an itemized statement which showed that the balance due the contractor was $63,291.63, which was the exact amount arrived at on May 10, 1933. At the end of this statement is the following note: "Above amount correct if no liquidated damages deducted." A copy of this statement was also sent by Bigelow to Mellor.

It is manifest from portions of Bigelow's testimony already quoted that he had on May 10, 1933, arrived at the amount he considered was due the contractor and that the only reason a voucher was not issued at that time was because the contractor and other interested parties did not agree with his figure. With knowledge that certain claims would be made by the contractor against the Territory and the likelihood of a dispute arising therefrom Bigelow, in the note to the statement sent to Alexander & Baldwin and the contractor, informed them that the Territory might make a charge for liquidated damages. In other words, he employed the item of liquidated damages for the purpose of coercing an acceptance of what he had determined the Territory should pay. This is made clear by his testimony to the effect that final settlement to his mind meant an agreement of the parties and that if a claim for $150,000 was to be pressed he would press a counterclaim for liquidated damages. · Nowhere in his voluminous and often confused and perplexing testimony did he recede from or modify this view. That he adhered to it is evidenced by his negative replies to frequent inquiries beginning prior to August, 1933, and continuing at intervals up to November 23, 1933, made by several attorneys for certain creditors as to whether final settlement had occurred. His reason for thinking final settlement had not been made is shown by his answer to the following question propounded on cross-examination: "Q Now, when you had these several conversations, Mr. Bigelow, with Judge Heen, Miss Ashford and Mr. Edmondson about final settlement you,

of course, were referring to the fact that you had not yet arrived at an agreement with the contractor—is that correct? A That is correct."

Of course Bigelow's opinion as to what constituted final settlement and his various statements indicating his belief that such settlement was not made until November 23 were mere conclusions of law and not binding on the surety. If the opinion of the government official as to the date of final settlement should be held determinative of that fact all certainty as to such date would be destroyed. The effect of such a rule would be to permit the officer in charge of the contract to extend the time of bringing suit against the surety beyond that fixed by the statute. In *United States* v. *Newport Shipbuilding Corporation,* 18 F. (2d) 556, the court said (p. 559) : "The subcontractor in effect argues that we shall hold the law to be that a suit is not brought too late if it be instituted within twelve months after the date at which the government official in charge says the final settlement was reached. But we do not think that a government official, after making final settlement within the meaning of the statute, can, by his mere declaration, without the knowledge or consent of the surety, extend the time during which suit may be brought against the latter."

Testifying in regard to his practice in assessing liquidated damages Bigelow said, in answer to a question put to him on redirect examination by counsel for plaintiff, that he generally reserved such assessment until final payment in order that a thorough investigation of all the various items of extra work, bad weather or anything that would delay the contractor, might be. made. On further recross-examination the following questions were asked him, to which he gave the following answers: "Q Now, last time you testified—at the last session when you testified—I didn't quite understand what your practice was in

connection with putting items of liquidated damages on the vouchers. Now, as I understand it, your practice is this, that you make up your last and final monthly estimate, and on that last and final monthly estimate you make all deductions, is that correct? * * * A That is correct. * * * Mr. Anthony: And in each and every case the final voucher is copied from the last estimate on the job, is that correct? The items on the final voucher are copied from the final estimate which you have theretofore approved? * * * A I think, in general, that is correct." That he had previously followed the practice indicated by his answers to the last two questions is shown by four other final estimates which he identified as records in his office and which were introduced for the purpose of showing his practice. In each of these estimates a deduction on account of liquidated damages was made from the amount due the contractor. So far as the record discloses Bigelow in no previous instance omitted liquidated damages when in his judgment liability for such damages had been incurred.

In view of his testimony that it was his practice to make *all deductions* in his final monthly estimates (which must mean all deductions which he considered he was entitled to make) it is hard to believe that he had any reason for omitting a charge for liquidated damages from the estimate of May 10 other than his belief that the contractor was not liable for such damages. That he had a sound basis for this belief is shown by a letter sent him by Mellor on March 4, 1933, in which an extension of time for completing the work, from February 2, 1933, to May 2, 1933, was requested for the following reasons, "rainy weather, authorizations for extra work and delays to contractor on account of traffic during the progress of cleanup work and also for the reasons given in our previous correspondence." There is nothing in Bigelow's testimony indicating that he ever questioned the correctness of Mellor's statement re-

garding the causes of delay. That he had no valid ground upon which to question it is shown by the testimony of A. P. Low, which is uncontradicted and free from any suspicion of untruth. This testimony established the fact that the delay in completing the work within the time fixed by the contract was due solely to occurrences and conditions over which the contractor had no control. In fact, on November 22, when Bigelow finally granted the extension, he did so for the very reasons enumerated in Mellor's letter of March 4.

The conclusion that in Bigelow's judgment the Territory had no claim for liquidated damages is strengthened by the fact that as soon as the contractor abandoned his claim for extras Bigelow withdrew his threat to make a claim for liquidated damages and issued a voucher for the exact amount he had determined on May 10 to be due.

Moreover, the contract provides in substance that the contractor is not liable for liquidated damages if in the judgment of the engineer the delay in completing the contract was due to causes beyond the contractor's control. It is apparent under this provision that Bigelow's authority to omit a charge for liquidated damages depended on his having reached the conclusion that the delay in completing the work within the agreed time was due to causes for which the contractor was not responsible. On the other hand, if in Bigelow's judgment, which according to the contract is final and binding upon the parties, the delay was due to causes within the control of the contractor his liability for liquidated damages became absolute and it was not within Bigelow's power to release him. It is evident therefore that Bigelow's delay in issuing vouchers was not due to any doubt in his mind of the correctness of his estimate of May 10, which did not include liquidated damages, but was due solely to his desire to induce the contractor to agree with that estimate.

To state it another way, the limit of Bigelow's power under the contract was to determine the causes of delay in completing the contract. If in his judgment the delay was due to causes within the control of the contractor it was beyond his power to release the contractor from the consequences. If instead it was his judgment that the delay was due to causes which were beyond the control of the contractor there was no liability for liquidated damages and therefore a release was unnecessary. It should not be assumed that Bigelow did something which he had no authority to do, that is, forego a charge which in his judgment should be made. It must be assumed, therefore, that his failure to make the charge was due to his judgment that the delay in completing the work was not attributable to the fault of the contractor.

One of two conclusions is inescapable—either that Bigelow did not make a charge for liquidated damages, although in his judgment the contractor was liable, or that he did not make it on May 10, or thereafter, because in his judgment there was no factual basis for it. To accept the first conclusion would be to say that he was willing to surrender a claim against the contractor which in his judgment was valid and binding and to issue a voucher for an amount which he knew was incorrect. This would of course be incompatible with honest and efficient stewardship—a criticism to which he should not be subjected without compelling reason. The second conclusion is consistent with his official fidelity. It is also consistent with his practice to include liquidated damages in his final estimates when in his judgment the contractor was liable for such damages. It likewise affords a rational explanation of why he was willing to issue a voucher on May 10, and thereafter, for the amount he considered due the contractor. Not even a plausible argument could be made that the date of final settlement could be affected by an ef-

fort to obtain an agreement to a final settlement by a threat to press a claim which the administrative officer knew was without foundation.

However that may be, the fact remains that the threat to press the claim was made for coercive purposes merely and as soon as this strategy succeeded the threat was abandoned.

Perhaps the leading case on the subject of final settlement is *Illinois Surety Co.* v. *Peeler*, 240 U. S. 214. Our statute, except for the period in which suits may be brought, is a replica of the federal statute, generally known as the Hurd Act, which the United States Supreme Court had under consideration. In the *Peeler* case the action was brought by subcontractors in the name of the United States to recover on the contractor's bond. On August 21, 1912, the supervising architect who had general supervision of the construction of the building called for by the contract made his statement of the amount due the contractor, recommending that only actual damages be charged against the contractor, and that a voucher for $3999.01 be issued. On that same day the Secretary of the Treasury, who was the officer in charge of the contract, approved the recommendation of the architect. The voucher having been issued and accepted on August 26, 1912, the disbursing clerk made out a check to the contractor on September 11, 1912. The action was instituted on March 6, 1913. The surety contended that the day of final settlement did not occur until the day of payment, September 11, 1912, and therefore the suit was premature. The court rejected the contention and held that August 21, 1912, was the day of final settlement. In considering the term "final settlement" the court gave the following definition, which has now become classic and which has been adopted in numerous federal cases (p. 221): "We think that the words 'final settlement' in the Act of 1905 had

reference to the time of this determination when, so far as the government was concerned, the amount which it was finally bound to pay or entitled to receive was fixed administratively by the proper authority. It is manifestly of the utmost importance that there should be no uncertainty in the time from which the six months' period runs. The time of the final administrative determination of the amount due is a definite time fixed by public record and readily ascertained. As an administrative matter, it does not depend upon the consent or agreement of the other party to the contract or account. The authority to make it may not be suspended, or held in abeyance, by refusal to agree. Whether the amount so fixed is due, in law and fact, undoubtedly remains a question to be adjudicated, if properly raised in judicial proceedings, but this does not affect the running of the time for bringing action under the statutory provision." (See also *Globe Indemnity Co.* v. *United States,* 291 U. S. 476.) It is our opinion that this rule is decisive of the instant case. On May 10 Bigelow had administratively determined for the government the amount that was due the contractor and his efforts between that time and November 23, to effect an agreement with the contractor, could not hold the date of final settlement in abeyance.

The *Peeler* case was followed by our immediate superior in jurisdiction in *United States Fidelity & Guaranty Co.* v. *United States* (CCA 9), 65 F. (2d) 639. In the latter case the United States had let a contract to one Rhivers for the improvement of a public road. The United States Fidelity and Guaranty Company became Rhivers' surety. Rhivers after doing part of the work abandoned it and the surety employed the Elliott Trucking Company to take it over. The trucking company also quit before completing the work and the government annulled the Rhivers contract and contracted with one Cavanagh to complete the

job, which he did in July, 1928. On August 24, 1928, the acting chief engineer of the bureau of public roads of the United States Department of Agriculture authorized the district engineer at Ogden, Utah, to pay Cavanagh. On November 6, 1928, the chief of the same bureau made claim by letter against the surety company for $9,361.95, the difference between the actual cost of the work and what the cost would have been under the Rhivers contract. It was stated in the letter (pp. 642, 643) that "The Rhivers contract has now been completed and we are in receipt of a statement of the final cost which shows that the claim which the government has against your company is $9,361.-95. * * * At any time that is agreeable to you we shall be glad to have the deferred conference concerning this matter, and other conditions growing out of this contract." Conferences and negotiations relative to the government's claim were had between the bureau of public roads and the surety, and correspondence between the Secretary of Agriculture and the Attorney General was carried on. On January 20, 1930, the Acting Secretary of Agriculture requested the Attorney General to bring suit against the surety. The latter referred the matter to the United States attorney for Maryland, who negotiated further with the surety. On June 10, 1930, the latter paid the claim. The suit, which was brought under the Hurd Act, was against the surety. It was instituted on May 1, 1931, by the United States for the benefit of certain creditors of Rhivers and the Elliott Trucking Company who had furnished the contractors with labor and material before their abandonment of the contract. The surety contended that the day it paid the claim to the government was the date of final settlement. The court, however, concluded that "final settlement" occurred on or before November 6, 1928, and therefore that the suit was barred. In support of its conclusion the court quoted at length from the *Peeler* case.

As to the effect of the conferences and negotiations on the date of final settlement the court said (p. 643): "But these negotiations did not and could not delay the date of 'final settlement.' As said by the court in Arnold v. United States (C. C. A. 4) 280 F. 338, 342: 'Defendants seek to avoid the effect of the settlement on the date in question, claiming that, although the work had been completed, the defendants had not acquiesced in the settlement. This position cannot be maintained. It is the ascertainment and determination by the proper governmental authorities of the amount due under the contract, that enables the government on the one hand, and subcontractors on the other, to assert their rights under the bond of the general contractor, and these rights cannot be held in abeyance by the mere failure of the general contractor to approve of what the government has done, or concur in the result thereof. Authorities are quite conclusive on this subject. Illinois Surety Co. v. United States, 240 U. S. 214, 36 S. Ct. 321, 60 L. Ed. 609, supra; United States v. Winkler (C. C.) 162 F. 397, 401; United States v. Bailey (D. C.) 207 F. 782, 783; United States v. Robinson, 130 C. C. A. 434, 214 F. 38; Robinson v. United States, 163 C. C. A. 637, 251 F. 461; United States v. Title Guaranty Co., 166 C. C. A. 320, 254 F. 958.' And in the Peeler case, the Supreme Court said: 'The time of the final administrative determination of the amount due is a definite time, fixed by public record, and readily ascertained. As an administrative matter, it does not depend upon the consent or agreement of the other party to the contract. * * * The authority to make it may not be suspended, or held in abeyance, by refusal to agree.' " In commenting on the fact that the amount first claimed by the government was identical with the amount that was finally paid the court said (p. 643): "The amount finally paid is the identical amount claimed from the beginning, indicating that the

amount was definitely and conclusively determined prior to the commencement of these latter negotiations." See also *Southern Surety Co.* v. *Western Pipe & Steel Co. of California* (CCA 9), 16 F. (2d) 456.

In support of its contention that final settlement was not arrived at by Bigelow until November 23, 1933, the plaintiff calls our attention especially to two federal cases —*United States* v. *George F. Pawling & Co.,* 297 Fed. 65, and *United States Fidelity & Guaranty Co.* v. *United States to the Use of Smoot,* 298 Fed. 365. The argument runs that since Bigelow did not waive liquidated damages until November 22, final settlement could not have occurred prior to that time.

In the *Pawling* case suit was instituted by the United States in behalf of materialmen against the contractor and his sureties. On September 26, 1918, Pawling & Company entered into a contract with the United States for the construction of a seaplane hangar at the navy yard in Philadelphia. The work was completed on July 24, 1919. In April, 1920, the amount of liquidated damages was agreed upon between the contractor and the United States, but because of a "difference in the figures, through clerical errors or otherwise, as to the amount of the allowance at the Navy Yard in Philadelphia and in the Department of the Bureau of Yards and Docks at Washington, the voucher was not prepared." Correspondence relating to this difference was carried on between the public works officer in charge of the work and the chief of the bureau of yards and docks at Washington. The latter, who had the authority to make final settlement, settled the difference on August 28, 1920, by a letter to the officer at Philadelphia. On September 15, 1920, the chief approved the voucher and payment was made on September 27, 1920. The action was brought March 7, 1921. The surety contended that final settlement occurred on December 5, 1919,

and therefore the action was barred. The trial court held that September 15, 1920, was the date of final settlement and therefore the action was premature. The material-men contended that August 28, 1920, was the day of final settlement and this contention was sustained by the appellate court. In rejecting the surety's contention the court used the following language, which the plaintiff in the case at bar argues should decide the present case (p. 67) : "As above stated, the defendants contend that the date of final settlement was made on December 5, 1919, when the contractor was paid about 80 per cent. of the amount due him; but this cannot be the date of final settlement, because the damages for delay had not at that time been determined, and it was then impossible to fix the amount due the contractor on final settlement."

We are of the opinion that the *Pawling* case is distinguishable from the instant case. In the *Pawling* case the delay in reaching an amount which was due the government did not result from a disagreement between the contractor and the administrative officer but from a disagreement between that officer and another government official. In these circumstances, under the rule announced in the *Peeler* case, the date of final settlement was necessarily held up awaiting a final determination by the government. If in the instant case there had been a difference of opinion on May 10 between Bigelow and any other territorial official who had some authority in the matter, as to the amount due the contractor, which difference was not settled until November 23, the *Pawling* case might be analogous.

In the *Smoot* case the suit was brought in the name of the United States for the use of Lewis E. Smoot, a materialman, against the contractor's surety, the United States Fidelity and Guaranty Company. The Faribault Building Corporation contracted with the United States on December 3, 1918, to furnish all material and labor for the

construction of a road and bridge at a naval station at the cost of $48,115. The plaintiff furnished all the sand and gravel required for the construction. Under the contract the government was permitted to make alterations, two of which were made during the progress of the work. The work was finished as altered before March 1, 1919. On May 23, 1919, the contractor and government signed a "Supplemental Agreement," and a new bond with other sureties was given by the contractor, conditioned for the faithful performance of the new contract. There was a stipulation signed by the defendant surety company which provided that the surety should remain liable upon its bond for the original work but not for the work required by the new agreement. Because of the alterations the total cost of the work was increased to $78,258, which amount was allowed by the government. When this amount was determined is not indicated except perhaps from what we will presently quote from the opinion. One of the surety's contentions was that the plaintiff's suit was barred. In holding that this contention was untenable the court said (p. 367): "But the record discloses that the administrative determination in this case took place on December 6, 1919, when the Bureau of Yards and Docks approved of the delivery of a final voucher for payment in full under the contract, 'without the assessment of damages for delay.' Up to that time such damages were actually due to the government from the contractor, and this was the first authoritative remission of the same; accordingly it established the date when the indebtedness of the government to the contractor was actually liquidated."

We think this case is also distinguishable from the instant case because there is no indication that the administrative officer had determined the amount due under the contract prior to the date when liquidated damages were remitted. For aught that appears to the contrary the

officer in charge of the contract may have made his administrative determination of the amount due the contractor on December 6, 1919, the very day when the item of liquidated damages was settled. In the instant case Bigelow had administratively concluded on May 10 that $63,291.63 was due the contractor and the question of liquidated damages arose subsequently for reasons which we have already stated. Moreover, the *Smoot* case definitely holds that the right of the government to liquidated damages was absolute. In our case the facts show that the Territory had no such right. Furthermore, the *Smoot* case evidently assumes that the administrative officer had unconditional authority to remit liquidated damages. Perhaps the contract there so provided. But in the instant case there is no such power conferred upon Bigelow.

For the foregoing reasons the judgment of the circuit court is reversed and a judgment dismissing the action will be signed upon presentation.

*J. G. Anthony* (*Robertson & Castle* on the briefs) for plaintiff in error.

*R. A. Vitousek* (*Smith, Warren, Stanley & Vitousek; Smith, Wild, Beebe & Cades; W. H. Heen; E. Vincent* and *A. E. Jenkins* on the brief) for defendants in error and certain intervenors.

*M. K. Ashford* (*F. E. Thompson* with her on the brief) for other intervenors.

Parsons, J., dissents.